## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION


**LETHERIA A. WILLIAMS,**

     **Plaintiff,**

**vs.**                                **Case No. 4:10cv1-MP/WCS**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

     **Defendant.**

_____/


### REPORT AND RECOMMENDATION

     This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D).   It is recommended that the decision of the Commissioner be reversed and remanded.

**Procedural status of the case**

     Plaintiff, Letheria A. Williams, applied for disability insurance benefits.  Her last date of insured status for disability benefits was September 30, 2007.  Plaintiff alleges disability due to a back disorder with herniated discs and disc disease, osteoarthritis, and knee disorder, with onset on May 12, 2005 (amended at the hearing, R. 580).

Plaintiff was 36 years of age on the alleged onset date, has a 12th grade education, and has past relevant work as a custodian for the state.  She was granted disability retirement by the State of Florida effective in April, 2003.  The Administrative Law Judge found that Plaintiff had the residual functional capacity to do a limited range of light work, can do several jobs identified by the vocational expert (general office clerk, packer, and dispatcher), and thus was not disabled.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber

v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.    Is the individual currently engaged in substantial gainful activity?

2.    Does the individual have any severe impairments?

3.    Does the individual have any severe impairments that meet or
       equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.    Does the individual have any impairments which prevent past
       relevant work?

5.    Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the administrative hearing**

The administrative hearing was held on November 27, 2007.  R. 561.  Plaintiff was 42 years of age at that time.  R. 564.  She testified that her surgery had not corrected her impairment, and she had the same symptoms.  R. 565.  She said she still hurt in her lower lumbar spine, and the pain radiated into both legs.  R. 565-566.  Bending forward and twisting side to side was painful.  R. 566.  She said that she had had shots and radio frequency treatment, and that had helped some.  R. 567.

Plaintiff testified that when she tries to stand doing laundry, with standing and some bending, it hurts "real bad" in her lower back, buttocks, and down her legs.  R. 568.  She said that standing to fix a meal also hurt.  R. 568-569.   She was able to get out of the house to shop, but standing and walking was difficult.  R. 569.  She said that when she sits for 30 to 45 minutes, she gets "real stiff" and it becomes painful.  *Id*.  She then stands and walks to get the stiffness out.  R. 570.

Plaintiff said that during two or three times a day she must lie down and elevate her legs on pillows because her lower lumbar spine hurts.  R. 570.  She said she must lie down each time about one hour.  *Id.*^

**Medical evidence**[1]

An MRI of Plaintiff's right knee on November 24, 1999, revealed a complete ACL tear, a calcified loose body, anserine bursitis, a tear of the lateral meniscus, and an unusual cystic collection.  R. 352.  On May 8, 2001, Plaintiff had low back pain with radicular symptoms, and an MRI of Plaintiff's lower back revealed a posterior central disc protrusion at L5-S1 with moderate impingement on the anterior aspect of the thecal sac and both nerve roots.  R. 360.  On December 7, 2001, Plaintiff reported left arm pain and numbness to her hand, and an MRI of the cervical spine revealed mild broad-based annular disc bulges at C5-C6 and C6-C7 without significant central canal

---

[1] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at < http://www.pdrhealth.com/drugs/drugs-index.aspx >. Information about medical terms and prescription drugs come from DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS, available at:  http://www.mercksource.com (Medical Dictionary link) or MEDLINE PLUS, found at: www.nlm.nih.gov/medlineplus/mplusdictionary.htm  or NATIONAL INSTITUTES OF HEALTH, found at: http://health.nih.gov .  Social Security Rulings can be found at: http://www.ssa.gov/OP_Home/rulings/rulfind1.html.    The pages at these websites are not attached to this report and recommendation as the information is relatively well-settled, the precise definitions are not at issue in this case, and the definitions are not likely to be in dispute.

stenosis or neural foraminal narrowing, and a Chiari I malformation[2] without evidence of syrinx involving the cervical cord.  R. 351.

There was no evidence of disc herniation in MRI scans of her lower back on March 5, 2002, and July 3, 2002, though on the latter date there was a mild broad based disc bulge at L5-S1, but with no canal or neuroforaminal stenosis.  R 355, 356, 357.

On July 26, 2002, Kamel Elzawahry, M.D., saw Plaintiff.  R. 401.  Plaintiff complained of pain in her neck radiating to her left arm, and pain in her back radiating to her left leg.  *Id*.  Dr. Elzawahry said that the results of EMG[3] and NCV[4] testing were consistent with C5-C6 radiculopathy.  *Id*.  He noted that an MRI of her lumbar spine

---

[2] Chiari malformations (CMs) are structural defects in the cerebellum, the part of the brain that controls balance.  When the indented bony space at the lower rear of the skull is smaller than normal, the cerebellum and brainstem can be pushed downward.  The resulting pressure on the cerebellum can block the flow of cerebrospinal fluid (the liquid that surrounds and protects the brain and spinal cord) and can cause a range of symptoms including dizziness, muscle weakness, numbness, vision problems, headache, and problems with balance and coordination.  There are three primary types of CM.  The most common is Type I, which may not cause symptoms and is often found by accident during an examination for another condition. Type II (also called Arnold-Chiari malformation) is usually accompanied by a myelomeningocele – a form of spina bifida that occurs when the spinal canal and backbone do not close before birth, causing the spinal cord to protrude through an opening in the back.  This can cause partial or complete paralysis below the spinal opening. Type III is the most serious form of CM, and causes severe neurological defects. Other conditions sometimes associated with CM include hydrocephalus, syringomyelia, and spinal curvature.  NATIONAL INSTITUTES OF HEALTH.

[3] An EMG is an electromyogram.  Electromyography is an electrodiagnostic technique for recording the extracellular activity of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

[4] Nerve conduction velocity testing.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

"showed [a] protruded disc at L5-S1."  *Id.*  On examination of her neck, Spurling's sign[5]

was positive on the left and she was tender on the posterior aspect of her neck.  *Id.*

She was found to have normal tone, power, coordination, and reflexes in both of her

upper and lower extremities.  R 400.

On September 24, 2002, an NCV and EMG of the lower lumbar paraspinous

region produced findings consistent with posterior primary rami spinal root irritation.  R.

409.  Another MRI was recommended.  *Id.*  Dr. Elzawahry noted that the NCV of

Plaintiff's left lower extremity was normal.  *Id.*

Another MRI of Plaintiff's lower back was performed on October 8, 2002.  R. 354.

The MRI revealed a minimal diffuse bulging annulus, a small annular tear, and mild disc

space narrowing at L5-S1, and mild facet hypertrophy at L4-L5.  *Id.*

Plaintiff had another MRI of her lower spine on October 13, 2002.  R 402.  This

revealed mild to moderate disc degeneration and mild disc space narrowing at L5-S1,

and early disc degeneration at L4-L5.  *Id.*  A very mild diffuse disc bulge was seen at

L5-S1 superimposed on degenerative end plate changes "resulting in partial effacement

of the proximal inferior foraminal fat bilaterally."  *Id.*  No nerve root impingement was

seen, however.  *Id.*  Mild degenerative facet joint changes were present at L4-L5.  R.

403.

Plaintiff received treatment by J. T. Caldwell, D.C., from November 6, 2002, to

---

[5] Spurling's sign is a test is used for evaluation of cervical spine radiculopathy.  The
patient laterally bends the neck to each side while maintaining a posture of cervical
extension.  Pain intensified with ipsilateral bending strongly suggests a diagnosis of
radiculopathy.  Pain with contralateral bending suggests musculo-ligamentous origin.
UNIVERSITY OF FLORIDA, COLLEGE OF MEDICINE, available at:
http://www.med.ufl.edu/rheum/rheumTests.htm

September 11, 2007.  See doc. 26, p. 12 for citations to the record.  Dr. Caldwell's treatment notes will not be extensively reported here, except as may be especially relevant to the issue of disability.

On December 16, 2002, Plaintiff was seen again by Dr. Elzawahry.  R. 398.  She continued to complain of pain radiating from her neck into her upper extremities and from her back into her lower extremities.  *Id.*  She was using a cane to ambulate and Dr. Elzawahry reported that she was "basically miserable."  *Id.*  Dr. Elzawahry noted the results of the October MRI and said that she could not sit or walk for any length of time. *Id.*  He said that her best position was lying down, and that she had not worked in 18 months.  *Id.*  He found her to be in mild to moderate distress.  *Id.*  Her cervical spine had pain to palpation and with extension.  *Id.*  She had pain with forward bending, but the straight leg raising test was negative for pain.  *Id.*  He found trigger points in the supraclavicular and scapular regions.  *Id.*  Tinel's sign[6] was positive on the left arm.  *Id.* Dr. Elzawahry's impression was cervical disc disease and low back pain, both with radicular symptoms, posterior primary rami spinal root irritation of the lower lumbar paraspinous region, but with a normal NVC of the left lower extremity, and EMG findings consistent with irritation and C6 radiculopathy with left carpal tunnel syndrome involving the sensory fibers.  *Id.*  Plaintiff told Dr. Elzawahry that physical therapy did not help.  *Id.* Dr. Elzawahry contemplated referral for a surgical opinion, and discussed possible job retraining.  *Id.*

---

[6] Tinel's sign is:  "A tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve.  It indicates a partial lesion or the beginning regeneration of the nerve."  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

On February 19, 2003, Plaintiff's chiropractor, Dr. Caldwell, said that he thought that Plaintiff had "severe limitation of functional capacity" and was permanently and totally disabled due to cervical and lumbar disc syndrome, knee ACL impairment, radicular and chronic pain.  R. 601.  He said she was restricted to no lifting and no standing for more than 15 minutes.  *Id*.  He did not think that Plaintiff's condition had stabilized.  *Id*.

On March 28, 2003, Plaintiff returned to Dr. Elzawahry.  R. 397.  She appeared to be depressed and tearful.  *Id*.  She continued to complain of radiating neck and back pain, and walking difficulty.  *Id*.  He noted that she had been found to have a torn meniscus in her knee.  *Id*.  He noted that a Dr. Bernard had recommended surgery.  *Id*.  On examination, Dr. Elzawahry found that Plaintiff suffered from general weakness, tenderness over the posterior aspect of her neck with limitation of motion of her neck and positive Spurling's sign, tenderness of the lumbar region, and positive for pain with forward bending and straight leg raising.  *Id*.  Dr. Elzawahry's assessment was cervical and lumbar disc disease with radiculopathy, and severe osteoarthropathy of the knee with a torn meniscus.  *Id*.  Dr. Elzawahry said he thought that Plaintiff was "totally and permanently disabled" and he signed a form for state disability retirement.  *Id*.  He referred Plaintiff to Dr. Maddox for a second opinion.  *Id*.  Bextra was prescribed.  *Id*.

On the same day, Dr. Elzawahry completed a form for State of Florida disability retirement.  R. 597.  Dr. Elzawahry said that he thought that Plaintiff was permanently incapable of any kind of work due to severe limitation of functional capacity.  *Id*.

Dr. Elzawahry referred Plaintiff to Dr. Karin Maddox for a second opinion.  R 397.  On March 28, 2003, Dr. Maddox completed the same form and reached the same

conclusion.  R. 599.  She said that Plaintiff could not work due to C5-C6 radiculopathy, neck pain, lumbar radiculopathy, and carpal tunnel syndrome.  *Id*.  She agreed that Plaintiff had "severe limitation of functional capacity" and was permanently and totally disabled.  *Id*.

On August 17, 2003, Dr. Elzawahry said that Plaintiff's diagnosis was post traumatic back and neck pain with radicular symptoms, and that her prognosis was unfavorable.  R. 395.  He assigned a 7% impairment rating.  *Id*.  He said that Plaintiff could not carry greater than 20 pounds, and had to avoid frequent movement of her spine and extreme changes of weather.  *Id*.  He said that Plaintiff's impairment was caused by  injury on the job on May 1, 2001.  *Id*.

On April 28, 2004, Plaintiff underwent diagnostic injections (disco grams).  R. 496.  The injection into the discs on the left side at L5-L5, L5-S1, and L3-L4 had "intrinsic disruption with dye leaking throughout the nuclear fibers and out beyond the nuclear fibers into the annular fibers, and all of those discs were 'diseased.' "  *Id*.  This injection recreated the pain that Plaintiff was experiencing at L3-L4 and L5-S1, especially much greater pain at L3-L4.  *Id*.  The conclusion was that the pain that Plaintiff suffers "is discogenic in nature from the L5-S1 discs."  R. 497.  On May 11, 2004, Plaintiff underwent discectomy at L5-S1.  R. 494.

After the surgery, Plaintiff was followed by Chris Kunis, M.D.  On July 21, 2004, Dr. Kunis said that Plaintiff's pain continued in her lower back into her right hip.  R. 484.  He said she had minimal facet disease at L4-L5 and L5-S1 bilaterally, and that could be the cause of this pain.  *Id*.

On August 19, 2004, Dr. Kunis again found that Plaintiff had ongoing pain in her lower back and intermittent pain down her legs.  R. 482.  She was not tolerating Naprosyn, and got headaches with that medication.  *Id.*  She was still taking Percocet two or three times a day.  *Id.*  He said her pain was more paraspinal and low, not center. *Id.*  He said that her pain was aggravated with extension of her spine, on standing with extension, and standing and ambulating.  *Id.*  He again noted that she had facet disease at L4-L5 and L5-S1.  *Id.*

On September 21, 2004, Dr. Kunis said that Plaintiff was still having right lower back pain into her buttocks and lower hip area.  R. 480.  He said: "The lower back pain, which has been persistent, now failed multiple treatments related to conservative management with nonsteroidal antiinflammatory drugs."  *Id.*   He said that her "left back pain has resolved since her surgery and is infrequent if often at all."  *Id.*  Dr. Kunis further noted that Plaintiff had headaches and cervical neck pain with a cervical disc problem at C5-C6.  *Id.*

On October 6, 2004, Dr. Kunis said that Plaintiff still had right hip and lumbar spine pain, and he thought that it could be caused by facet disease.  R. 478.  He suspected facet disease in L3-L4, L4-L5, and L5-S1.  *Id.*  He said that Plaintiff has lower cervical and upper thoracic pain.  *Id.*  He also said that Plaintiff had some cervical pain at C6 and C7 with left arm radiculopathy.  *Id.*  An MRI of the cervical, thoracic, and lumbar spine was ordered.  *Id.*

On November 13, 2004, an MRI of Plaintiff's lumbar spine revealed mild perineural fibrosis involving primarily the left S1 nerve root at L5-S1 (with previous surgery on the left), mild degeneration of the disc, but no recurrent herniation.  R 388.

The other lumbar levels were "virtually normal."  *Id.*  A cervical MRI the same date revealed a mild Chiari malformation "with some crowding of the brain stem, but no obvious compression and no evidence of cervical cord syrinx," and a small, posterior disk protrusion at C5-C6 with a smaller disk bulge at C6-7 and mild Luschka joint hypertrophy at C3-C4.  R. 386.

On December 15, 2004, Dr. Kunis again saw Plaintiff.  R 476.  He said that she still had lower back pain into her right hip, right buttock, and right posterior thigh and calf.  *Id.*  He said that this either was S1 joint pain or from the S1 nerve root on the right, and that she had had successful decompression of the nerve root on the right at that level.  *Id.*  Dr. Kunis noted that the MRI had shown no significant abnormalities.  *Id.*  He said that Plaintiff also had posterior cervical pain over the distribution of the C7 nerve root on the left, and had cervical degenerative disc disease at C5-C6 and C6-C7 with associated headaches.  *Id.*  He said that these headaches were Plaintiff's number two complaint.  *Id.*  He renewed Plaintiff's prescription for Percocet and scheduled a diagnostic injection of the S1 nerve root on the right and then the S1 joint on the right if the nerve root injection failed to relieve the pain.  *Id.*

On January 19, 2005, the diagnostic injection was cancelled because Plaintiff had swelling of her right knee due to a tear of her anterior cruciate ligament.  R. 474. Plaintiff reported that Percocet controlled her pain reasonably well.  *Id.*  Dr. Kunis's assessment was low back pain, right lower extremity pain, and right knee pain.  *Id.*

On February 2, 2005, Plaintiff saw Dr. Elzawahry again.  R. 394.  She complained of headaches and low back pain.  *Id.*  She had had back surgery in May,

2004.  *Id*.  She was using Tylenol and Percocet[7] for pain.  *Id*.  On examination, Dr. Elzawahry found that Plaintiff had mild tenderness to palpation of her cervical spine, lumbar spine, and her occipital region, and was positive for pain with forward bending. *Id*.  Straight leg raising, however, was negative for pain.  *Id*.  Her muscle tone and strength was symmetrical.  *Id*.  Her gait, tandem walking, station, and base were normal.  *Id*.  Dr. Elzawahry repeated his findings as to Plaintiff's impairment rating and limitations.  *Id*.  His diagnosis was cervical and lumbar disc disease based upon an MRI showing an annular tear at the posterior aspect of L5-S1, facet hypertrophy at L4-L5, EMG findings consistent with primary rami spinal root irritation in the lower lumbar paraspinous region, a normal NCV of the lower extremities, and an EMG showing irritation at C5-C6 with radiculopathy and left carpal tunnel syndrome involving sensory nerves.  *Id*.

On May 2, 2005, Plaintiff again saw Dr. Elzawahry.  R. 393.  He said that she appeared to be in pain and "a great deal of distress," and used a cane for walking.  *Id*. He said that she had had good response to lumbar surgery, but was again having back pain radiating to her right gluteal region and the posterior aspect of her thigh and leg. *Id*.  He noted that Plaintiff's motor system "revealed normal tone, power, coordination and reflexes in both upper and lower extremities."  *Id*.  Her gait was also normal.  *Id*. However, Plaintiff had "marked tenderness over the region of the lower ack with

---

[7] Percocet, a narcotic analgesic, is used to treat moderate to moderately severe pain.  It contains two drugs – acetaminophen and oxycodone.  Acetaminophen is used to reduce both pain and fever.  Oxycodone, a narcotic analgesic, is used for its calming effect and for pain.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

extension of the spine reproducing her symptoms," and forward bending was positive for pain. *Id*.

Plaintiff returned to Dr. Elzawahry on May 12, 2005, for NCV and EMG testing. R. 391. He said that Plaintiff appeared to be in some distress. *Id*. She said she had neck pain radiating to her shoulders. *Id*. Her gait was again normal. *Id*. She had tenderness over the lower back and both sciatic notches with pain on forward bending and straight leg raising. *Id*. Dr. Elzawahry's diagnosis was back pain with radicular symptoms with evidence of facet disease, most pronounced at L4-L5 and L5-S1 as noted by MRI, and perineural fibrosis primarily involving the left S1 nerve root at L5-S1, a positive EMG showing posterior primary rami spinal root irritation in the lower lumbar and upper sacral paraspinous regions, and degenerative changes in the cervical region with evidence of mild chiari malformation. R. 390. Lortab and a round of epidural steroid and lumbar facet injections were prescribed. *Id*. In June, 2005, Plaintiff had a series of four lumbar facet injections. R. 333-336.

On June 15, 2005, Dr. Kunis completed a mental impairment form. R. 450. He said he did not think that Plaintiff had a mental impairment that significantly interferes with her daily functioning. *Id*. The record does not explain why Dr. Kunis, who provided care after Plaintiff's spinal surgery, was asked to give an opinion as to her mental condition.

On August 31, 2005, Plaintiff reported to Dr. Elzawahry that the injections had "helped a great deal," but radicular pain had returned to her neck, shoulder, and arm. R. 282. Lortab had been helpful, but caused nausea. *Id*. Dr. Elzawahry determined that her symptoms had worsened. *Id*. Plaintiff was increasingly depressed since she

could not return to work and was not financially comfortable.  *Id*.  He noted: "She is certainly depressed and tearful."  *Id*.  On examination, he found that she had tenderness over her neck and extension of the neck caused pain.  *Id*.  Plaintiff also had "marked tenderness" in her lower back, and extension of her spine caused pain.  *Id*.  Her motor system had normal tone, power, coordination, and reflexes in both of her upper and lower extremities.  *Id*.  When her gait was examined, it was again noted that she used a cane to walk.  *Id*.  His diagnosis remained the same.  *Id*.

On September 6, 2005, an MRI of Plaintiff's cervical spine revealed the same impairments as previously noted, on November 13, 2004.  R. 389.  There was minor Luschka[8] joint hypertrophy at C3-C4, a small posterior disc bulge at C5-C6, not extending to the cord, a minor posterior disc bulge at C6-C7, and a mild Chiari 1 malformation.  *Id*.  Likewise, the MRI of Plaintiff's cervical spine had findings unchanged from the November 13, 2004, MRI.  R. 383.  Plaintiff also again underwent additional NCV and EMG testing, with normal results.  R. 284.  However, it was noted that she had "give-away weakness in all muscles tested in the upper extremities."  *Id*.

On September 20, 2005, Plaintiff was still symptomatic.  R. 280.  Dr. Elzawahry said that she had persistent headaches, and persistent neck and back pain.  *Id*.  He noted that the latest NCV and EMG studies were normal, though a previous EMG had showed evidence of denervation.  *Id*.  He switched her to Percocet.  *Id*.

---

[8] The Luschka foramen is either of two openings each of which is situated on one side of the fourth ventricle of the brain and communicates with the subarachnoid space. MEDLINE PLUS (MERRIAM-WEBSTER).

On December 22, 2005, Plaintiff had worsening symptoms and was seen by Dr. Elzawahry on an emergency basis.  R. 279.  He observed that she had benefitted from a treatment program by Dr. Caldwell.  *Id.*  Plaintiff was in some distress.  *Id.*  Her motor system had normal tone, power, coordination, and reflexes in both extremities.  R. 278. She still used a cane to walk.  *Id.*  She had tenderness over her lower back.  *Id.*  Dr. Elzawahry's diagnosis was worsening neck pain with radicular symptoms and back pain with radicular symptoms with evidence of facet disease most pronounced at L4-L5 and L5-S1.  *Id.*  He recommended that Plaintiff "increase activities to tolerance," follow-up with Dr. Caldwell, and continue with her medications.  *Id.*

On February 2, 2006, Plaintiff saw Dr. Caldwell.  R. 373.  She said she had neck pain extending into her left arm, and mid to lower back pain extending into her right lower extremity, and that her pain had been getting progressively worse.  *Id.*  Dr. Caldwell found subluxation at C2, C5, T6, and L5, biomechanical dysfunction, paraspinal tenderness, and trigger points for pain.  *Id.*

On February 6, 2006, Dr. Elzawahry noted that Plaintiff was "somewhat discouraged because of persistence of her symptoms."  R. 277.  Plaintiff thought that she could benefit from injections (and this had been recommended by Dr. Caldwell), but could not afford that treatment, and Dr. Elzawahry pursued a "hardship" waiver of the costs.  *Id.* and R. 276.  Plaintiff appeared to be depressed and tearful.  R. 277.  Her motor systems in both extremities (tone, power, coordination, and reflexes) were again normal.  *Id.*  Gait was normal.  *Id.*  Plaintiff's spine was tender with forward bending and straight leg raising.  R. 276.  In April, 2006, Plaintiff twice had lumbar paravertebral nerve blocks.  R. 338-339.

On June 14, 2006, state agency physician Robert Steele, M.D., expressed his opinion as to Plaintiff's residual functional capacity.  R. 308-315.  Dr. Steele did not examine Plaintiff, but reviewed the medical records, presumably to that date.  He said that he thought that Plaintiff could lift 20 pounds occasionally, 10 pounds frequently, could stand for at least 2 hours in an 8 hour workday, could sit about 6 hours in an 8 hour workday, and had postural limitations.  R. 309-310.  He thought that Plaintiff's reported symptoms were credible.  R. 313.

On July 27, 2006, Dr. Elzawahry said that Plaintiff had again initially responded favorably to the injections, but again was having pain.  R. 272.  Dr. Elzawahry explained that injections could not be given frequently, especially since Plaintiff is a young woman and could develop osteoporosis and septic necrosis.  *Id.* and R. 273.  Her motor tone and power were again found to be normal.  R. 272.  Plaintiff had worsening pain in her lower back.  R. 272-273.  Endocet was prescribed.  R. 273.

On October 19, 2006, Dr. Caldwell saw Plaintiff.  R. 252.  Her left hand had "given out" and she had spilled boiling water onto the left side of her body.  *Id.*  She experienced increased pain in her neck, back, and arm since then because she had moved suddenly in response to the boiling water.  *Id.*  He noted increased muscle spasms.  *Id.*

On October 28, 2006, Dr. Elzawahry again saw Plaintiff.  R. 270.  She had developed severe radicular neck pain associated with numbness and tingling of her left arm.  *Id.*  It was again noted that she had dropped a pot of hot water and suffered second degree burns on her left side.  *Id.*  Plaintiff was depressed and tearful.  *Id.*  Her motor system and gait were normal.  *Id.*  Plaintiff had tenderness of the neck, and

extension reproduced pain. *Id.* Spurling's sign was positive. *Id.* She also had pain in her lower back and both sciatic notches, and forward bending and straight leg raising were positive for pain. *Id.* Dr. Elzawahry's diagnosis was an acute exacerbation of neck pain with radicular symptoms, with sudden onset of numbness of Plaintiff's left arm, and back pain with radicular symptoms. R. 270-271. She was to continue with Lidoderm patches, Lyrica[9] was prescribed, and it was thought that she might need an antidepressant. R. 271. An MRI, NCV, and EMG were again scheduled. *Id.*

An MRI of Plaintiff's cervical spine was conducted on November 2, 2006. R. 249. A minimal central to right paracentral disc bulge was seen at C5-C6, with no herniated nucleus pulposus and no significant stenosis. *Id.* The rest of the cervical spine was normal. *Id.* NCV and EMG testing on November 28, 2006, was normal. R. 245.

Plaintiff returned to Dr. Elzawahry on January 9, 2007. R. 240. Her neck pain had been stable, but back pain had worsened. *Id.* Dr. Elzawahry said she was in some pain, walked with a limping gait, and used a cane. *Id.* Her motor system in both extremities was normal. *Id.* She had increased tenderness in her lower back. *Id.* Dr. Elzawahry's diagnosis was neck and back pain with radicular symptoms, and normal NCV and EMG testing, without evidence of radiculopathy. R. 239. Percocet was prescribed. *Id.*

---

[9] Lyrica is used in patients 18 years of age and older with nerve pain called diabetic neuropathy, postherpetic infection nerve pain, fibromyalgia (a condition in which there is widespread pain in the muscles and soft tissues surrounding the joints throughout the body), and in combination with other medications to reduce the incidence of seizures. PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

On March 5, 2007. J. T. Caldwell, D.C., Plaintiff's treating chiropractor, said that Plaintiff had pain in her neck and mid to lower back, a headache, and pain into her lower extremities.  R. 231.  She had fallen on January 10, 2007, due to the effects of her medication.  *Id*. and R. 229.  Plaintiff said she had not been able to get any substantial relief in any activity or position.  R. 231.  Her headache was described as throbbing, and she said she had had sudden headaches since she had fallen.  *Id*.  She was also fatigued since her fall.  *Id*.  She had seen a psychiatrist for depression, and was prescribed medication, but she was unable to take it due to side effects.  *Id*.  She had tenderness in her cervical, thoracic, and lumbar spine, with point tenderness at C2, C5, T6, and L5.  R. 230.  She had weakness in her cervical and lumbar spine.  *Id*.  Dr. Caldwell referred Plaintiff to a psychiatrist.  *Id*.

On April 10, 2007, Dr. Elzawahry saw Plaintiff.  R. 224.  He noted that she had sustained a fall after laparoscopic surgery.  *Id*.  He said that her neck and back pain was associated now with paresthesia of her upper and lower extremities.  *Id*.  Despite that finding, Dr. Elzawahry's notes again contain the sentence that: "Examination of the motor system revealed normal tone, power, coordination, and reflexes in both upper and lower extremities."  *Id*.  Plaintiff was depressed and tearful.  *Id*.  Her gait was normal.  *Id*.  Plaintiff had tenderness in her lower back, and forward bending and extension of her spine caused pain.  *Id*.  Dr. Elzawahry's diagnosis was acute exacerbation of neck and back pain with radicular symptoms.  *Id*.  He again ordered an MRI of Plaintiff's cervical and lumbar spine, and prescribed Percocet and Skelaxin.[10]  R.

---

[10] Skelaxin is prescribed "as an adjunct to rest, physical therapy, and other measures for the relief of discomforts associated with acute, painful musculoskeletal conditions."

223.  Dr. Elzawahry wrote a letter to Dr. Caldwell, stating that he had hoped her

symptoms would abate, and that in fact she had been doing fair in January, but that he

had prescribed a strong pain medication and a muscle relaxant.  R. 222.

On May 2, 2007, another lumbar MRI revealed signs of a prior left laminotomy at

the L5-S1, a "likely post operative scar surrounding the left S1 nerve root," but with no

mass effect or signs of recurrent disc herniation.  R. 216.  The MRI also revealed pre-

existing degenerative disc disease at the L5-S1 level with minor bright signal annular

fibers consistent with an annular tear, but without mass effect.  *Id.*  All other lumbar disc

space levels were normal.  *Id.*  An MRI of Plaintiff's cervical spine on the same date

revealed a small right paracentral disc bulge just effacing the anterior thecal sac at C5-

C6, but without cord impingement, nerve root displacement, or foraminal stenosis.  R.

217.  At C6-C7, there was minor cervical spondylosis, without significant disc bulge,

protrusion, or nerve root displacement.  *Id.*

On June 18, 2007, Dr. Elzawahry saw Plaintiff again.  R. 260.  She reported

increasing neck pain.  *Id.*  She had swelling of her left arm, and had asked to see Dr.

Elzawahry on an emergency basis.  *Id.*  She said that the pain was severe when she

moved her left arm.  *Id.*  She was in some distress.  *Id.*  Dr. Elzawahry found that

Plaintiff had tenderness over the posterior region of her neck and in her lower back (with

pain on forward bending and extension).  *Id.*  Her left arm was slightly swollen, and pain

with movement of that arm suggested panniculi[11] to Dr. Elzawahry.  *Id.*  Her motor

system was found to be normal, as with other examinations, and her tandem walking,

PHYSICIANS' DESK REFERENCE (2004), p. 2181.

[11] A panniculus is a sheet or layer of tissue.  MEDLINE PLUS (MERRIAM-WEBSTER).

gait, station, and base were normal.  *Id*.  Another trial of the Medrol Dosepak was ordered.  R. 261.

On July 16, 2007, Plaintiff was seen by Dr. Elzawahry.  R. 258.  She came in for follow-up with a Medrol Dosepak for her left arm pain, which had done well for that pain. *Id*.  She had pain radiating into her left shoulder greater than the right, and radiating across her back and into her lower extremities greater on the left than the right.  *Id*. Plaintiff reported that she had slipped and fallen the previous Saturday and caught herself with her left arm, and her left arm was painful "almost back to when she saw him [Dr. Caldwell] in June."  *Id*.  Plaintiff denied suffering from depression or side effects from medication.  *Id*.  She was in mild distress.  *Id*.  She had mild tenderness to palpation of her cervical spine and pain on extension, but with negative Spurling's test, and no spasms or trigger points.  *Id*.  Her lumbar spine was tender to palpation and was positive for pain on forward bending.  *Id*.  She had diffuse trigger points for pain on palpation of her left shoulder with full range of motion.  *Id*.  Dr. Elzawahry's diagnosis was neck pain and left shoulder pain responsive to Medrol Dosepak, but with exacerbation, and low back pain facet disease.  R. 259.  Her ordered a TENS unit, and prescribed Lidoderm patches, Percocet, and Skelaxin.  *Id*.  He cautioned her to take as little of the narcotic medication as possible since it is potentially addicting.  *Id*.

On September 11, 2007, Dr. Elzawahry noted that the radio frequency diagnostic that he had ordered for Plaintiff's lumbar spine had "worked wonderfully," but the effects had worn off.  R. 256.  Radio frequency had not helped her neck pain.  *Id*.  Plaintiff said she did not like the injections, that they had made her feel "funny."  *Id*.  They did not help the left shoulder pain either.  *Id*.  Plaintiff used a TENS unit for her back, but it did

not help her neck.  *Id.*  She was seeing the chiropractor, Dr. Caldwell, every three weeks and that helped her neck and back.  *Id.*  She was not working and thought that she was disabled.  *Id.*  Dr. Elzawahry found minor tenderness to palpation of Plaintiff's cervical spine, the Spurling's test was negative, and there were no trigger points or spasms.  *Id.*  Plaintiff's lumbar spine was tender to palpation, and she had pain with extension.  *Id.*  Plaintiff had full range of motion of her left shoulder, but had pain there with palpation.  *Id.*  Dr. Elzawahry observed that her motor systems had normal bulk and tone, without atrophy or fasciculations, she had normal strength in all extremities, and her gait was normal.  R. 257.  On September 25, 2007, Dr. Elzawahry entered a note that Plaintiff's examination had remained essentially unchanged, additional radio frequency treatment was scheduled, but "unfortunately she remains symptomatic."  R. 255.  He said that Plaintiff was "in a great deal of pain."  *Id.*

On November 30, 2007, Dr. Elzawahry completed functional limitation forms.  R. 590-593.  He said that he thought that Plaintiff's pain would be "distracting to adequate performance of daily activities or work," that physical activity would cause an increase of pain to such an extent that bed rest or medication would be necessary, that medication would present some side effects but not to cause serious problems, and that Plaintiff would have to lie down every 30 minutes in an 8 hour work day.  R. 590-591.  Dr. Elzawahry thought that Plaintiff's pain was consistent with her underlying medical condition.  R. 591.  Dr. Elzawahry thought that Plaintiff could sit 2 hours in total in an 8 hour work day, but could sit for only 1 hour at a time, was limited to standing and walking for only 1 hour, but could stand and walk for only 30 minutes at a time.  R. 592.  He thought that she could never stoop, bend, crawl, or climb.  R. 593.

**Legal analysis**

**Whether the ALJ erred in his reliance upon state agency opinions instead of the opinions of the treating physician and treating chiropractor**

Defendant acknowledges that the ALJ should not have relied upon a lay opinion (the "single decision-maker") from a state agency, but argues that it was proper for the ALJ to have relied upon the opinion of Dr. Steele, the non-examining state agency physician, rejecting the opinion of the treating physician, Dr. Elzawahry, and the evidence from Dr. Caldwell.  Doc. 31, pp. 6-10.

The opinion of a claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  This is so because treating physicians:

> are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).  Important to the determination of whether there is a "detailed, longitudinal picture" of impairments is the length of the treatment relationship, the frequency of examination, the extent of the knowledge of the treating source as shown by the extent of examinations and testing, the evidence and explanation presented by the treating source to support his or her opinion, the consistency of the opinion with the record as a whole, and whether the treating source is a specialist with respect to the particular medical issues.  20 C.F.R. § 404.1527(d)(2)-(5).

The reasons for giving little weight to the opinion of a treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir.

1992), and must be clearly articulated.  Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th

Cir. 2004).  "The Secretary must specify what weight is given to a treating physician's

opinion and any reason for giving it no weight, and failure to do so is reversible error."

MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).  "Where the Secretary has

ignored *or* failed properly to refute a treating physician's testimony, we hold as a matter

of law that he has accepted it as true."  *Id.* (emphasis added); Elam v. Railroad

Retirement Bd., 921 F.2d 1210, 1217 (11th Cir. 1991); Critchfield v. Astrue, 2009 WL

635698 (N.D. Fla. Mar 10, 2009) (No. 308cv32-RV/MD).

### Whether the ALJ erred in relying on a lay opinion as a medical opinion

Plaintiff first argues that the ALJ erred by relying upon the lay opinion of a "single

decision maker," Adrian Owens Thomas.  Doc. 26, p. 16.  The ALJ said that the "two

state agency physical residual functional capacity assessments which noted a wide

range of light work activity (Section F/131-138, 246-253) [R. 423-430, the opinion of

"Owens Thomas Adrian" and R. 308-315, the opinion of Robert Steele, M.D.] are given

significant weight."  R. 25.  The ALJ referred to these two opinions as coming from

"medical consultants."  *Id.*  The ALJ cited these opinions in part as the reason to reject

the contrary opinions of treating physicians Dr. Elzawahry and Dr. Maddox, and treating

chiropractor, Dr. Caldwell.  R. 24-25.

Adrian Owens Thomas, however, was not a medical doctor; he was a disability

examiner.  R. 445, 35.  Defendant concedes that this opinion was not from a medical

source and that it was error for the ALJ to have relied upon it as a "medical consultant."

Doc. 31, p. 6.  Defendant argues that the error was harmless because the ALJ also

relied upon the opinion of Dr. Steele.  *Id.*  It was not harmless, as will be discussed ahead.

### Whether the non-examining opinions were unsigned and not entitled to any weight as evidence

Plaintiff also contends that the ALJ relied on "unverified opinions from non-examining sources."  Doc. 26, p. 17.  Since the opinion of Thomas is to be discounted, this argument addresses the opinion of Dr. Steele.

Plaintiff argues that the Rules require state agency physician opinions to be signed.  *Id.*  She points to POMS DI 26510.089, § B which she alleges provides: "The typed name of an MC/PC on an electronic message or worksheet is not considered a true signature."  *Id.*, n. 4.  Furthermore, Plaintiff argues that Agency documents containing only a typed name should be rejected as unauthenticated and unreliable.  *Id.*, *citing* Wade v. Astrue, 2008 WL 4538997, *2 (N.D. Ind., Oct. 7, 2008).

In Wade, the claimant's psychiatric review technique and mental residual functional capacity assessment forms were not signed, but contained typed names.  Wade, 2008 WL 4538997, * 2.  The court also noted the Commissioner did not provide any support for the argument that the forms were "reliable because they included typed signatures."  *Id.*

The rule cited by Plaintiff applies to the initial case processing and states that:

Once the MC/PC completes the medical portion of the disability determination, he or she must choose one of the following signature options: [1] Sign only the appropriate medical assessment form(s), as instructed in DI 26510.089B.1.a; or [2] Sign both the disability determination form(s) and the appropriate medical assessment form(s), as instructed in FI 26510.089B.2.

POMS DI 26510.089, § B.[12]  However, under POMS DI 26510.089, § A.4:

> Each medical assessment form must have a reviewing MC/PC's actual
> physical signature *or an approved electronic signature* - unless the DE is a
> single decisionmaker (SDM).

(Emphasis added.)  Thus, the rule expressly provides for an approved electronic

signature.

Furthermore, the Electronic Disability Guide Procedures for the Electronic

Process, POMS DI 810.  POMS DI 81020.130, Electronic Case Closure, provides:[13]

> The Disability Examiner (DE) completes the disability determination forms
> (e.g., SSA-831/832/833), Personalized Disability Notices (PDNs), and any
> supplemental rationales by using the Disability Determination Services
> (DDS) case processing systems.  These forms are signed with an
> approved electronic signature via the DDS case processing system and
> do not require a handwritten signature.

Plaintiff's argument on this issue is unpersuasive.

---

[12] This is available at:

https://secure.ssa.gov/apps10/poms.nsf/lnx/0426510089

[13] This is available at:

https://secure.ssa.gov/apps10/poms.nsf/lnx/0481020130

### Whether the opinion of Dr. Steele was based upon an incomplete record and whether his rationale was well-supported by the record

Plaintiff argues that the opinion of Dr. Steele, who did not examine Plaintiff, was based upon an incomplete record and was not well supported by the reasons given. Doc. 26, p. 17.

Dr. Steele's opinion is dated June 14, 2006.  R. 315.  Thus, he could not have considered the medical evidence in this record discussed above from July 27, 2006, through November 30, 2007.  It is especially significant that Dr. Steele did not have Dr. Elzawahry's residual functional capacity assessment dated November 30, 2007, since Dr. Steele did not treat or examine Plaintiff.

Further, Dr. Steele found Plaintiff's description of her symptoms to be credible. R. 313.  He noted she had had positive pain signs from an EMG (consistent with radiculopathy) and the straight leg raising test (SLR).  *Id.* and R. 309.  He determined that she had radicular LBP (lower back pain).  R. 312.  He determined that Plaintiff's ability to stand or walk was reduced to 2 hours "for radicular pain," yet he said she could stand or walk "at least" 2 hours in an 8 hour day, implying that she could exceed 2 hours for those activities.  *Id.*  Plaintiff's argument, that the opinion of Dr. Steele was not well supported by the reasons given, is persuasive.

### Whether the ALJ's reasons for rejecting the opinion of Dr. Elzawahry, the treating physician, are supported by substantial evidence in the record

The ALJ did not "accept" the opinions of Dr. Elzawahry, reasoning in part that Dr. Elzawahry's "opinions are not supported by the medical evidence showing mild findings on magnetic resonance imaging."  R. 24.  Earlier in the opinion, he had noted the history

of MRI scans.  R. 23.  He determined that a November, 2004, MRI after surgery showed

"only mild abnormalities" of Plaintiff's lumbar spine.  *Id*.  He bolstered that conclusion

with the observation that Dr. Kunis, in December, 2004, agreed.  *Id*.  He noted that an

MRI of Plaintiff's cervical spine in September, 2005, showed "small disc protrusions at

C5-6 and C6-7 and some other mild abnormalities but no evidence of complication," and

were unchanged from the November, 2004, MRI of the cervical region.  *Id*.  He noted

that an EMG in September, 2005, "showed no evidence of cervical radiculopathy."  *Id*.

Finally, the ALJ observed that a May, 2007, MRI showed "minor spondylosis at C5-6

and C6-7 but no evidence of disc herniation," and a lumbar spine MRI study on the

same date "showed pre-existing degenerative disc disease at L5-S1 but no signs of a

recurrent disc herniation."  *Id*.

Plaintiff underwent discectomy at L5-S1 on May 11, 2004. R. 494.  Therefore, the

medical record after that surgery is the most relevant to Plaintiff's claim.

On September 21, 2004, Dr. Kunis said that Plaintiff's "left back pain has

resolved since her surgery and is infrequent if often at all."  R. 480.  But Plaintiff's pain

continued in her lower back into her right hip, and Dr. Kunis thought that Plaintiff had

minimal facet disease at L4-L5 and L5-S1 bilaterally, and that could be the cause of this

pain.  R. 484.  The pain persisted, and Dr. Kunis said that multiple treatments "related to

conservative management with nonsteroidal antiinflammatory drugs" had failed.  R. 480.

Dr. Kunis further noted that Plaintiff had headaches and cervical neck pain with a

cervical disc problem at C5-C6.  *Id*.

On November 13, 2004, an MRI of Plaintiff's lumbar spine revealed mild

perineural fibrosis involving primarily the left S1 nerve root at L5-S1 (with previous

surgery on the left), mild degeneration of the disc, but no recurrent herniation.  R 388.  A cervical MRI on November 13, 2004, revealed a mild Chiari malformation "with some crowding of the brain stem, but no obvious compression and no evidence of cervical cord syrinx," and a small, posterior disk protrusion at C5-C6 with a smaller disk bulge at C6-7 and mild Luschka joint hypertrophy at C3-C4.  R. 386.

On February 2, 2005, Dr. Elzawahry's diagnosis was cervical and lumbar disc disease based upon an MRI showing an annular tear at the posterior aspect of L5-S1, facet hypertrophy at L4-L5, EMG findings consistent with primary rami spinal root irritation in the lower lumbar paraspinous region, a normal NCV of the lower extremities, and an EMG showing irritation at C5-C6 with radiculopathy and left carpal tunnel syndrome involving sensory nerves.  R. 394.  His diagnosis on February 12, 2005, was much the same.  R. 390.

On September 6, 2005, an MRI of Plaintiff's cervical spine revealed the same impairments as the November 13, 2004, MRI.  R. 389.  The MRI of Plaintiff's cervical spine conducted on November 2, 2006, showed milder impairments, a minimal central to right paracentral disc bulge at C5-C6, with no herniated nucleus pulposus and no significant stenosis.  R. 249.  On May 2, 2007, another lumbar MRI revealed signs of a prior left laminotomy at the L5-S1, a "likely post operative scar surrounding the left S1 nerve root," but with no mass effect or signs of recurrent disc herniation.  R. 216.  The MRI also revealed pre-existing degenerative disc disease at the L5-S1 level with minor bright signal annular fibers consistent with an annular tear, but without mass effect.  *Id.* All other lumbar disc space levels were normal.  *Id.*  An MRI of Plaintiff's cervical spine on the same date revealed a small right paracentral disc bulge just effacing the anterior

thecal sac at C5-C6, but without cord impingement, nerve root displacement, or foraminal stenosis.  R. 217.  At C6-C7, there was minor cervical spondylosis, without significant disc bulge, protrusion, or nerve root displacement.  *Id.*

Some of the MRI evidence cannot be reasonably characterized as mild.  The November, 2004, MRI, as well as the MRI on May 2, 2007, revealed a post operative scar surround the left S1 nerve root.  Dr. Elzawahry twice referred to this as an annular tear at the posterior aspect of L5-S1.  Dr. Elzawahry also found that Plaintiff had had facet hypertrophy at L4-L5, EMG findings consistent with primary rami spinal root irritation in the lower lumbar paraspinous region, and an EMG showing irritation at C5-C6 with radiculopathy and left carpal tunnel syndrome involving sensory nerves.

Even if these MRI studies, however, could reasonably be characterized as revealing only mild problems, other significant evidence was overlooked.  Although Dr. Kunis felt that the November 13, 2004, MRI had shown no significant abnormalities, he said that Plaintiff nonetheless had posterior cervical pain over the distribution of the C7 nerve root on the left, and had cervical degenerative disc disease at C5-C6 and C6-C7 with associated headaches.  R. 476.  Further, From August 19, 2004, through September 11, 2007, the treating medical sources repeatedly found that Plaintiff was in significant pain, that her movements were limited by pain, that she tried medication and nerve blocks, without much success, and that conservative treatment had failed.  R. 484, 482, 480, 478, 476, 394, 391, 282, 280, 279, 373, 272, 270, 240, 231, 224, 260, 258, and 256.  Thus, the ALJ's determination that Dr. Elzawahry's opinion should be disregarded because the results of the MRI studies were mild is not supported by substantial evidence when all of the evidence is considered.

The ALJ also reasoned that Dr. Elzawahry's opinion should be discounted because his opinion was "not supported by the other evidence including his own treatment notes which indicate capacity to lift up to 20 pounds."  R. 25.  A statement that the opinion of the treating physician must be discounted because "not supported by other evidence including his own treatment notes" might be a good beginning for a discussion of the evidence, but on its own, is facially insufficient to comply with Eleventh Circuit precedent.  The ALJ must point to specific substantial evidence in the record and in the treatment notes.

That Dr. Elzawahry thought that Plaintiff had a capacity to lift up to 20 pounds is not substantial evidence to disregard Dr. Elzawahry's opinion as to her residual functional capacity.  A proper residual functional capacity assessment must determine an individual's functional limitations "on a function-by-function basis."  SSR 96-8p, ¶ 4.

> Exertional capacity addresses an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of seven strength demands: *Sitting*, standing, walking, lifting, *carrying,* pushing, and pulling.  *Each function must be considered separately* (e.g., "the individual can walk for 5 out of 8 hours and stand for 6 out of 8 hours"), even if the final RFC assessment will combine activities (e.g., "walk/stand, lift/carry, push/pull").

*Id.* (emphasis added).  The exertional ability to lift is different from the exertional ability to sit, stand, or walk.  A person might be able to occasional lift 20 pounds and be completely unable to sit, stand, or walk for 8 hours in a workday.

Finally, the ALJ dismissed Dr. Elzawahry's opinion, reasoning that "the opinion that the claimant is disabled is an issue reserved to the Commissioner and it is

inconsistent with the state agency consultants' assessments that the claimant is capable of light work."  R. 25.

The lay opinion of Adrian Owen Thomas was not substantial evidence in the record to disregard the opinion of a treating physician.  The opinion of Dr. Steele was not well-supported by the record, and did not consider important medical evidence after the opinion was rendered.  More important, "[t]he opinions of nonexamining, reviewing physicians . . ., when contrary to those of the examining physicians, are entitled to little weight, and standing alone do not constitute substantial evidence."  Sharfarz v. Bowen, 825 F.2d 278, 280 (11th Cir. 1987).  See also, Swindle v. Sullivan, 914 F.2d 222, 226 n.3 (11th Cir.1990) (the opinion of a non-examining physician is "entitled to little weight and taken alone does not constitute substantial evidence to support an administrative decision" ), citing, Broughton v. Heckler, 776 F.2d 960, 962 (11th Cir.1985).

In connection with state disability retirement, Dr. Elzawahry did state on March 28, 2003, that Plaintiff was totally and permanently disabled.  R. 597.  This opinion is perhaps entitled to lesser weight because it predated Plaintiff's spinal surgery, which seems to have helped some of her pain.  It seems to me to be error, however, to refuse to discuss such an opinion because whether or not a claimant is disabled is an issue reserved to the Commissioner.  In civil cases in this court, experts routinely and properly express opinions touching upon ultimate issues.  Cf., Federal Rule of Evidence 704(a): "Except as provided in subdivision (b), testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."  Of course, the Administrative Law Judge decides this

ultimate issue, based upon the evidence in the record, but that does not mean that the opinion was devoid of probative value.  The ALJ has the duty to discuss and evaluate the opinion in light of all of the evidence.

But more important, the most relevant opinion of Dr. Elzawahry, the one rendered on November 30, 2007, was not an opinion that Plaintiff is disabled.  It was an opinion as to her residual functional capacity.  R. 590-593.  Plaintiff is entirely correct that the ALJ's insistence that the residual functional capacity opinion of Dr. Steele, who did not treat or examine Plaintiff, supersedes the residual functional capacity opinion of the treating physician, Dr. Elzawahry because it was an opinion as to *disability*, is nonsense.

It has long been the rule in this circuit that:  "Where the Secretary has ignored **or** failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true."  MacGregor, 786 F.2d at 1053 (emphasis added); Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1217 (11th Cir. 1991); Critchfield v. Astrue, 2009 WL 635698 (N.D. Fla. Mar 10, 2009) (No. 308cv32-RV/MD); Cole v. Barnhart, 436 F.Supp.2d 1239 (N.D. Ala. 2006) (finding that the opinions of the treating physician must be accepted as true where the ALJ "did not properly refute them" but did not ignore them).

But there is now some doubt as to whether that is the proper procedure.  In Winschel, *supra*, the court said:

> The ALJ did not mention the treating physician's medical opinion, let alone give it "considerable weight."  Likewise, the ALJ did not discuss pertinent elements of the examining physician's medical opinion, and the ALJ's conclusions suggest that those elements were not considered.  It is

possible that the ALJ considered and rejected these two medical opinions,
but without clearly articulated grounds for such a rejection, we cannot
determine whether the ALJ's conclusions were rational and supported by
substantial evidence.

631 F.3d at 1179.  The court remanded to correct this error.  *Id.*

In Harris v. Astrue, 546 F.Supp.2d 1267 (N.D. Fla. 2008) (No. 5:07cv44-

RS/EMT), the court likewise remanded, not because the ALJ had failed to mention or

discuss the treating physician's opinion, but because the ALJ gave improper reasons to

discount the opinion of a treating physician (did not refute it), but did not ignore it.

Harris distinguished MacGregor as a case where the ALJ made no finding as to the

weight of the opinion of the ALJ, *i.e.*, he *ignored* the opinion.  786 F.Supp.2d at 1282.

In Norman v. Commissioner of Social Sec., 2011 WL 824802, *2 (M.D. Fla. Feb.

14, 2011) (No. 6:09-CV-1594-ORL-31), *Report and Recommendation Adopted by* 2011

WL 825623 (M.D. Fla. Mar. 3, 2011), where the ALJ failed to follow this circuit's rules for

evaluating a treating physician's opinion, remand was recommended because the

evidence did not establish "disability beyond doubt" or that the claimant had "suffered

an injustice."  Citing Winschel, the court said that "the weight to be given such evidence

is for the ALJ to determine, not the Court."  *Id.*, at *12, n. 11.  To like effect is Herrera v.

Astrue, 2011 WL 816797 (M.D. Fla. Mar. 2, 2011) (No. 3:10-CV-00293-J-JBT)

(remanding).

The ALJ's discussion of the reasons for disregarding Dr. Elzawahry's residual

functional capacity opinion are insufficient and that opinion must now be accepted as

true.  However, remand is recommended as the decision of whether, in light of that

established residual functional capacity, Plaintiff is capable of doing other work that exists in sufficient numbers in the national economy.

### Whether the ALJ erred in failing to state in the hypothetical that Plaintiff must use a cane to walk

Plaintiff asserts that the ALJ erred by failing to find that she needs a cane to walk. While the ALJ did not explicitly make that finding, he did find that she can stand and walk up to 2 hours in an 8 hour day. R. 21. He also noted that while there is evidence that Plaintiff has impairment of her right knee, "no physician imposed restrictions" related to that condition. R. 24. These findings implicitly find that Plaintiff does not need a cane to ambulate.

The notations about a normal gait appear rather unreliable to me, as if those words stay in the medical report unchanged if Dr. Elzawahry failed to change them. Indeed, on May 2, 2005, Dr. Elzawahry noted that Plaintiff appeared to be in pain and a great deal of distress, used a cane for walking, and then said her gait was normal. R. 393. Nonetheless, while it was often noted that Plaintiff's gait was normal and there was no notation that she was using a cane to walk. R. 394, 393, 391, 277, 224, 260, 257, it was also often noted that Plaintiff was in serious pain and using a cane to walk, R. 398, 397, 482, 393, 282, 279, 240. The ALJ's determination that no physician "imposed restrictions" relating to Plaintiff's right knee impairment, that is, no assistive device was ever prescribed, is supported by substantial evidence in the record, but is weak evidence that she did not need a cane from time to time. One can obtain a cane without a prescription. The hypothetical to the vocational expert should have included a need occasionally to use a cane to stand and walk.

**Whether the ALJ properly considered the opinion of Dr. Caldwell, the chiropractor**

The ALJ determined that Dr. Caldwell was "not an acceptable medical source," but acknowledged that he did have a long treatment history with Plaintiff.  R. 25.  He then rejected the opinion of Dr. Caldwell because "it is an issue reserved to the Commissioner and it is inconsistent with the other evidence of record from the treating physicians."  *Id.*

Dr. Caldwell's opinion on February 19, 2003, predated Plaintiff's spinal surgery.  Dr. Caldwell said that he thought that Plaintiff had "severe limitation of functional capacity" and was permanently and totally disabled due to cervical and lumbar disc syndrome, knee ACL impairment, radicular and chronic pain.  R. 601.  He said she was restricted to no lifting and no standing for more than 15 minutes.  *Id.*  He did not think that Plaintiff's condition had stabilized.  *Id.*  The opinion, therefore, touched upon both functional limitations and the ultimate issue.  It should not have been discounted simply because it addressed those relevant issues.

Social security regulations distinguish between medical opinion and opinions from other medical sources.  20 C.F.R. §§ 404.1513(a) and (e) (disability benefits); 20 C.F.R. §§ 416.913(a) and (d) (supplemental security income benefits).  Licensed physicians and psychologists are deemed "acceptable medical sources" by paragraph (a)(1) and (2).  Nurse practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists are examples of those considered as "other sources" by paragraph (d)(1), but are not "acceptable medical sources."  Thus, less weight is

accorded the opinion of a chiropractor.  Griego v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991).

Evidence from "other sources" still must be duly considered.  Shontos v. Barnhart, 328 F.3d 418, 426 (8th Cir. 2003), citing 20 C.F.R. § 404.1513(d)(1) (nurse practitioner); Williams v. Apfel, 98 F.Supp.2d 625, 631 (E.D. Pa. 2000); McClellan v. Apfel, No. 98-1288-WEB, 2000 WL 433094, at * 8-9 (D. Kan., April 12, 2000) (and cases cited).

Social Security Ruling 06-03p clarifies the procedures that should be followed when the record contains evidence from an "other source."  That Ruling provides that medical sources who are not "acceptable medical sources" should be considered along with all of the evidence.  The Ruling provides that the same factors guiding the evaluation of an "acceptable medical source" will also govern the evaluation of a medical source that is not an "acceptable medical source" and a "non-medical source." Those factors are:

> • How long the source has known and how frequently the source has seen the individual;
> • How consistent the opinion is with other evidence;
> • The degree to which the source presents relevant evidence to support an opinion;
> • How well the source explains the opinion;
> • Whether the source has a specialty or area of expertise related to the individual's impairment(s); and
> • Any other factors that tend to support or refute the opinion.

SSR 06-03p.  The Ruling provides that:

However, depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source.  For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion.

*                    *                    *

Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity.  Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case. . . .

SSR 06-03p.

Dr. Caldwell's opinion was consistent with his own treatment notes and the treatment notes of the treating physician, Dr. Elzawahry.  He had a long history of treatment with Plaintiff.  The reasons given by the ALJ to discount Dr. Caldwell's opinion, and to give it no weight, are not supported by substantial evidence in the record and do not follow the guidelines of the social security ruling.

**Whether the ALJ erred in determining that Plaintiff's testimony was not credible**

Pain and other symptoms reasonably attributed to a medically determinable impairment are relevant evidence for determining residual functional capacity.  Social Security Ruling 96-8p, p. 4.  Pain and other symptoms may affect either exertional or non-exertional capacity, or both.  *Id.*, p. 6.

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.  *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so.  *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).  Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true.  *See Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).  The reasons articulated by the ALJ for disregarding the claimant's subjective testimony must be based upon substantial evidence.  Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991).  It is not necessary that the ALJ expressly identify this circuit's standard if his findings "leave no doubt as to the appropriate result" under the law.  Landry v. Heckler, 782 F.2d 1551, 1553-1554 (11th Cir. 1986).

The ALJ determined that Plaintiff's testimony was "credible when considering the objective medical evidence but not to the extent that she is disabled."  R. 24.  This is much the same finding as made by Dr. Steele, who also said that Plaintiff's reports of pain were credible.  R. 313.  The ALJ determined that Plaintiff's testimony that she can

sit for 30 to 45 minutes and then stand and walk, was credible.  R. 24.  He determined,

however, that her testimony that she must lie down two or three times a day for one

hour was not credible as "no physician, treating or otherwise, has ever indicated that

there is any medical reason why the claimant's activities should be so limited."  *Id.*

This reasoning is not supported by substantial evidence in the record.  On

November 30, 2007, Dr. Elzawahry determined that Plaintiff's pain would be "distracting

to adequate performance of daily activities or work," that physical activity would cause

an increase of pain to such an extent that bed rest or medication would be necessary,

that medication would present some side effects but not to cause serious problems, *and*

*that Plaintiff would have to lie down every 30 minutes in an 8 hour work day.*  R. 590-

591.  Dr. Elzawahry thought that Plaintiff's pain was consistent with her underlying

medical condition.  R. 591.  Dr. Elzawahry thought that Plaintiff could sit 2 hours in total

in an 8 hour work day, but could sit for only 1 hour at a time, was limited to standing and

walking for only 1 hour, but could stand and walk for only 30 minutes at a time.  R. 592.

He thought that she could never stoop, bend, crawl, or climb.  R. 593.  As explained

above, Dr. Elzawahry's residual functional capacity opinion must now be accepted as

true.  It fully supports Plaintiff's testimony, and should have been so considered by the

ALJ.  Thus, Plaintiff's testimony as to limitations, especially her need to frequently lie

down to alleviate pain, must now be deemed to be true.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge

were not based upon substantial evidence in the record and did not correctly follow the

law.  The decision of the Commissioner to deny Plaintiff's application for benefits should

be reversed.  The case should be remanded to the Administrative Law Judge to

determine whether Plaintiff was disabled on the amended onset date based upon the

residual functional capacity assessment determined by Dr. Elzawahry on November 30,

2007.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to

deny Plaintiff's application for Social Security benefits be **REVERSED** and the case be

**REMANDED** to the Administrative Law Judge to determine whether Plaintiff was

disabled on the amended onset date based upon the residual functional capacity

determined by Dr. Elzawahry on November 30, 2007.

**IN CHAMBERS** at Tallahassee, Florida, on April 25, 2011.


 S/     William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**


**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**